UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> GLENN DESHAWN BROWNE, <br><br> Defendant. | Case No.: SACR 16-00139-CJC <br><br> **ORDER DENYING DEFENDANT GLENN DESHAWN BROWNE'S MOTION TO SUPPRESS EVIDENCE** |

## I. INTRODUCTION

Defendant Glenn Deshawn Browne has been charged with one count of conspiracy to receive, possess, conceal, store, sell and dispose of stolen firearms in violation of 18 U.S.C. § 371; one count of receipt, possession, concealment, storage, sale and disposal of

stolen firearms in violation of 18 U.S.C § 922(j); and one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  (Dkt. 14 (Indictment).)  Before the Court is Defendant's motion to suppress evidence, namely, "[a]ny and all observations of a Glock (Serial Number ZFR859) blue steel semi automatic handgun with black plastic grips, a black plastic Glock magazine with a 150 round capacity, and 6 live 9 mm Luger rounds of ammunition."  (Dkt. 44 [Motion, hereinafter "Mot."] at 2.)  For the following reasons, the motion is DENIED.

**II.  BACKGROUND**

On August 20, 2016, at 8:13 p.m., a woman called 911 and said "Please send a police officer, right now.  To [address].  There's a man in the back with a gun."  (Dkt. Dkt. 48-1 [Declaration of Scott Tenley, hereinafter "Tenley Decl."] Ex. 1-A at 1:8–9.)  After clarifying her address, the 911 operator asked for a description of the man, and the caller responded, "He's black with a black hat.  All black.  And a black Camaro."  (*Id.* at 1:20–21.)  The operator then asked if the suspect was in the car or walking around, and she responded "He's at my door now.  He's in the back."  (*Id.* at 1:22–23.)  When the operator asked "He's in your backyard?" and she responded "Yeah, hurry."  (*Id.* at 1:24–25.)  The caller then identified herself as "Lisa" and provided her telephone number.[1]  (*Id.* at 2:1–4.)  When the operator asked, "Do you know him?  Do you know his name?" the caller frantically responded "Come on, please, hurry up" before providing his name (Darquisse[2]) and stating that he was her 36-year old ex-boyfriend.  (*Id.* at 2:7–15.)  After

---

[1] The telephone number provided by "Lisa" is the same number provided to law enforcement by Jonhesha White during the subsequent investigatory stop. (Tenley Decl. Ex. 11 at 6:50–7:10.) Additionally, when Defendant later sought to recover money that the police took from the Camaro, he was accompanied by a female companion who introduced herself as Zakiyah, Defendant's sister. (Dkt. 48-2 ¶ 9.) However, she provided LAPD with that same telephone number, which was listed in the DMV records for Jonhesha White. (*Id.* ¶¶ 9–10.) The Government reasonably believes that "Lisa" from the 911 call is Jonhesha White. (Dkt. 48 at 2 n.2.)

[2] The transcript of the call identifies this name as "Marquish," but a review of the recording indicates that the caller actually identified him as "Darquisse." (Dkt. 48 at 2 n.3; *see also* Tenley Decl. Ex. 1 at

some dispatch information was shared on the call, the caller repeated her plea, "Please hurry up" and "He's at my door." (*Id.* at 2:21–3:12.) The operator then broadcast to officers "415[3] man with a gun. [Caller's address].  Suspect is a male black wearing a black hat.  36 years old.  Black clothing.  Armed with a hand gun.  It's code three incident." (*Id.* at 3:5–9.)  In the background of the call, someone then asked "Who's that n***** with a gun?" before the call was disconnected and police continued their dispatch communications. (*Id.* at 3:15–23.)  The police tried to call her back but reached an automated voicemail message that repeated her telephone number. (*Id.* at 3:23–4:3.)

A Los Angeles Police Department ("LAPD") helicopter responded to the scene. (Dkt. 48-3 [Declaration of Jonathan Delgadillo, hereinafter "Delgadillo Decl."] ¶ 6.)  An officer in the helicopter confirmed that an individual matching the suspect's description and the Camaro were near the caller's address. (Tenley Decl. Ex. 1-A at 3:5–9; 3:19–20, 4:4–5.)  He reported that the suspect was getting "in and out" of the driver's seat of the Camaro. (Delgadillo Decl. ¶ 6.)  Officers Jonathan Delgadillo and David Dixon were on their way to the scene when they heard the reports from the helicopter concerning Defendant's description and whereabouts. (*Id.* ¶¶ 4, 6.)  They arrived at 8:16 p.m. with their sirens blaring and saw Defendant sitting in the driver's seat of the Camaro, and a woman (later identified as his girlfriend, Jonhesha White) standing outside the passenger door. (Delgadillo Decl. ¶ 7; Tenley Decl. Ex. 10.)  They drew their weapons and ordered Defendant out of the car and then told him to lie on the ground face-down. (Delgadillo Decl. ¶ 7.)  They told the woman to come close to the police unit. (*Id.* ¶ 9.)  The officers then detained Defendant and placed him in their vehicle. (*Id.*)  The officers had requested backup, which came soon after Delgadillo and Dixon's arrival. (*Id.* ¶ 10; Dkt. 48-4 [Declaration of Alejandro Puche, hereinafter "Puche Decl."] ¶¶ 4–5.)

---

1:21–25.) "Darquisse" is also the false name that Defendant provided to the police for several days after his arrest. (Dkt. 48-2 ¶ 4.)
[3] 415 is code for "disturbing the peace." (Dkt. 48-3 ¶ 3.)

Officer Rene Santos conducted a frisk of Defendant's outer clothing for weapons and did not discovery any. (Mot. Ex. A at 229.) Instead Officer Santos found multiple denominations of currency in his pocket. (*Id.* at 230.) As soon as Defendant was detained, Officers Delgadillo, Dixon, Puche, and Armendariz searched the Camaro for weapons. (Delgadillo Decl. ¶ 10; Puche Decl. ¶¶ 5–6; Tenley Decl. Ex. 10 at 2:40.) Officer Puche first searched the driver's side of the car and did not find any weapons, so he moved on to the passenger side. (Puche Decl. ¶ 7.) He probed underneath the passenger seat using a flashlight and saw three white tube socks. (*Id.*; *id.* Ex. A.) He felt the socks and they were "bulgy;" he "suspected that the socks contained narcotics, but also believed they could have held a weapon." (*Id.* ¶ 7.) The socks actually contained bindles of US currency wrapped in rubber bands (later determined to total about $26,000). (*Id.*; Mot. at 6; *id.* Ex. A at 229; Dkt. 48 [Opposition, hereinafter "Opp."] at 5.) Officer Puche then checked the center console area and radio area and did not find anything there. (Puche Decl. ¶ 8.) Finally, he checked the glove box. (*Id.* ¶ 9.) Based on his police experience and prior experience as an automobile mechanic, Officer Puche knew that a "glove box tray can be quickly and easily removed by hand." (*Id.*) With his hands he pressed the sides of the glove box and it popped off. (*Id.*) At the suppression hearing, he testified that it took little force to accomplish this—he likened it to the amount of force necessary to squeeze a toilet paper roll. When he shined his flashlight into the area behind the glove box, he saw the butt of a firearm in the upper left of the cavity with the barrel directed toward the passenger seat "as if the driver had reached across and hidden the firearm." (*Id.* ¶ 10; *id.* Exs. B, C.) He testified that the gun was easily accessible and that he found it within seconds.

Officer Anchondo also spoke to the female witness, "Jonhesha," and asked if she knew why they were there, to which she responded that she did not. (Mot. Ex. A at 230.) She said that Defendant was her boyfriend and they had one child together. (*Id.*) She said she was at the house, her aunt's residence, to pick up her son. (*Id.*) When asked if

she knew anything about the firearm, she said that she did not. (*Id.*) When asked if she knew anything about money in the vehicle, she said that her boyfriend had just won it in Las Vegas. (*Id.*)

Based on the presence and packaging of the US currency found in the car, Officer Delgadillo formed the opinion that narcotics might be stored in the vehicle. (Delgadillo Decl. ¶¶ 15–16.) The Camaro was towed to the LAPD station, where it was subject to a K-9 search. (*Id.* ¶ 17.) The K-9 unit alerted to the rear of the vehicle for narcotics. (*Id.* ¶ 18.) The police then searched the car for narcotics but none were found. (*Id.*) The K-9 also sniffed the money recovered from the Camaro and again alerted for the scent of narcotics. (*Id.*)

### III. DISCUSSION

#### A. Standing

"In order to contest the legality of a search or seizure, the defendant must establish that he or she had a 'legitimate expectation of privacy' in the place searched or in the property seized." *United States v. Kovac*, 795 F.2d 1509, 1510 (9th Cir. 1986). "The term 'standing' is often used to describe an inquiry into who may assert a particular fourth amendment claim. Fourth amendment standing is quite different, however, from 'case or controversy' determinations of article III standing. Rather, it is a matter of substantive fourth amendment law; to say that a party lacks fourth amendment standing is to say that his reasonable expectation of privacy has not been infringed." *United States v. Taketa*, 923 F.2d 665, 669 (9th Cir. 1991) (internal citations omitted). "The defendant has the burden of establishing that, under the totality of the circumstances, the search or seizure violated his legitimate expectation of privacy in a particular place." *Kovac*, 795 F.2d at 1510.

In the context of an automobile search, a defendant who has "neither a property nor a possessory interest in the automobile, nor an interest in the property seized" lacks Fourth Amendment standing. *Rakas v. Illinois*, 439 U.S. 128 (1978) (defendants lacked standing "since they made no showing that they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers."); *see also United States v. Portillo*, 633 F.2d 1313, 1317 (9th Cir. 1980) ("Under the facts of this case, Portillo is in the same position as were the petitioners in *Rakas*. He was merely a passenger in the Dodge. He 'asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized.'"). On the other hand, "a defendant may have a legitimate expectation of privacy in another's car if the defendant is in possession of the car, has the permission of the owner, holds a key to the car, and has the right and ability to exclude others, except the owner, from the car." *United States v. Thomas*, 447 F.3d 1191, 1198 (9th Cir. 2006). The Ninth Circuit has also recently held that an unauthorized driver of a rental car "only has standing to challenge the search of a rental automobile if he received permission to use the rental car from the authorized renter." *Id.* at 1199 ("[I]t is undisputed that Thomas failed to show that he received McGuffey's permission to use the car. Therefore, the district court properly concluded that Thomas lacks standing to challenge the search.").

In this case, the Camaro is owned by and registered to an uninvolved third party identified as "G.B." (Tenley Decl. ¶ 9; *id.* Ex. 7.) In or around June 2016, "G.B." lent the Camaro to "Tanisha," a woman he knew through a mutual friend, because he was not using it and she needed a car.[4] (*Id.* Ex. 2 at 1:40, 2:50.) "G.B." regained possession of the car approximately two months later when he was notified that the vehicle was impounded and went to recover it. (*Id.* at 1:26, 2:53.) In an interview with the police,

---

[4] The Government believes that "Tanisha" is Tanisha Watson. (Opp. at 9 n.7.) During a traffic stop of Defendant and Watson in 2014, Watson told officers that Defendant was her fiancé. (Tenley Decl. Ex. 6 at 9.)

"G.B." said "I guess her boyfriend was in the car—I don't know who was in the car when it was taken" and "I don't know the gentleman's name." (*Id.* at 1:39–1:49.)

In a post-arrest, Mirandized interview, Defendant admitted that the car did not belong to him. (Dkt. 48-2 (Declaration of Jesse Audelo) ¶ 5.) Nor has he offered any evidence to suggest that "G.B." or "Tanisha" loaned him the car. Defendant submitted a supplemental declaration that simply stated,

> [t]he Camaro had been loaned to me and I traveled in that car to and from Las Vegas for a couple days. While traveling in that car I put all my personal belongings in that car for safe keeping including but not limited to two back packs, one containing my personal belongings and one containing my personal tools of my work; I also had approximately $26,742.52 which I put in three tube socks and in my pockets. . . . I also put my DVDs in the glove compartment and watched those DVDs with a DVD player that extended out from the interior of the glove box. Besides the DVDs and the DVD player there were other items in the glove box which were mine and which I used during the trip to and from Las Vegas.

(Dkt. 50-1 ¶ 3.) He also states that he put such personal property in the car "for my travel and for safe keeping." (*Id.* ¶ 4.) While Defendant arguably could have had a possessory interest in the car under *Thomas* if he could establish that he had permission from the registered owner ("G.B.") or an authorized person in control of the car ("Tanisha"), *see* 447 F.3d at 1198, Defendant never identifies the person who loaned him the car, (*see* Dkt. 50-1). There is no evidence establishing that "Tanisha" gave him *permission* to use it. *See United States v. Rodriguez*, 100 F. Supp. 3d 905, 917–18 (C.D. Cal. 2015) ("[T]he only evidence of defendant's claimed possessory interest in the Cadillac is defendant's own vague statement as set forth in the police report that he 'bought the vehicle a few days [prior] from a friend he did not know the name to [sic].' Defendant has not presented any documentary evidence or testimony that would support a claim that he

purchased the Cadillac or was otherwise in lawful possession of it. In light of the government's undisputed evidence that the car was registered at the time to an individual named Hector Gomez and had been for years . . . defendant must do more than merely point to an uncorroborated claim of ownership at the time of arrest and argue that not all car purchases are reflected in registrations.") (internal citations omitted). Defendant has not met his burden of demonstrating a possessory interest in the Camaro, so he did not have a reasonable expectation of privacy. Consequently, he lacks standing to challenge the search of the Camaro.

**B. Stop and Frisk**[5]

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In *Terry v. Ohio*, 392 U.S. 1 (1968), however, the Supreme Court recognized that a brief, investigative stop was an exception to the general rule requiring law enforcement to obtain a warrant based on probable cause before conducting a search or seizure. *Terry* also permitted a protective search for weapons in the absence of probable cause where a police officer "has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id.* at 27. The Supreme Court reasoned that "[w]hen an officer is justified in believing that the individual whose

---

[5] The Court recognizes that "[t]he Supreme Court has rejected the 'doctrine of hypothetical jurisdiction,' in which a federal court assumes jurisdiction for the purpose of reaching the merits, as the practice 'carries the courts beyond the bounds of authorized judicial action.'" *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1172 (9th Cir. 2013) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). The Court proceeds to the merits of Defendant's claims here as an alternative basis to deny the motion in the event that the Ninth Circuit concludes that Defendant has standing to challenge the search of the Camaro.

suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id.* at 24. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27.

Defendant argues that the police relied only on an "uncorroborated anonymous tip" in making the investigatory stop and search. (Mot. at 8–13.) Reasonable suspicion may arise from information provided to law enforcement via a tip, provided the tip has sufficient "indicia of reliability." *Adams v. Williams*, 407 U.S. 143, 147 (1972). "Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations—for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime—the subtleties of the hearsay rule should not thwart an appropriate police response." *Id.*

Two cases, *Navarette v. California*, 134 S. Ct. 1683 (2014), and *United States v. Terry-Crespo*, 356 F.3d 1170, 1171 (9th Cir. 2004), are particularly instructive here. In *Navarette*, a police dispatcher in Humboldt County told a neighboring Mendocino County 911 dispatch team about a tip from a 911 caller, stating: "Showing southbound Highway 1 at mile marker 88, Silver Ford 150 pickup. Plate of 8–David–94925. Ran the reporting party off the roadway and was last seen approximately five [minutes] ago." *Navarette*, 134 S. Ct. at 1686–87. An officer responded to the broadcast, found the truck at mile marker 69 at 4:00 p.m. (about eighteen minutes after the 911 call was placed), and pulled it over. *Id.* at 1687. Another officer responded separately, and as the two

approached the truck they smelled marijuana. *Id.* They searched the truck bed and found 30 pounds of marijuana. *Id.* They arrested the passenger and the driver, who moved to suppress the evidence. *Id.* The Supreme Court determined that, even *assuming* the tip was anonymous, it "bore adequate indicia of reliability" for several reasons. *Id.* at 1688–89. First, "the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving" which "lends significant support to the tip's reliability." *Id.* at 1689. Second, police confirmed the truck's location near mile marker 69, roughly nineteen miles south of the location reported in the call, at 4:00 pm, roughly eighteen minutes after the 911 call was placed. *Id.* "That sort of contemporaneous report has long been treated as especially reliable." *Id.* Third, the Court noted the caller's use of the 911 emergency system—a "911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity. . . . 911 calls can be recorded, which provides victims with an opportunity to identify the false tipster's voice and subject him to prosecution." *Id.* The Court concluded that "the 911 caller's report of being run off the roadway created reasonable suspicion of an ongoing crime such as drunk driving," so the stop was proper. *Id.* at 1690.

In *Terry-Crespo*, "José Domingis called 911 to report that a man had, three minutes earlier, threatened him with a .45 handgun. He described the suspect as a twenty-year old Hispanic male, attired 'like a gang member' with a hat, white and blue jersey, brown jacket, and backpack." *Terry-Crespo*, 356 F.3d at 1172. He identified himself, though he spelled his name as "Domingis," rather than the more common and expected spelling, "Dominguez," likely because he "was not a native English-speaker and spoke English with difficulty." *Id.* When asked for a callback number, however, he said he did not know the number because he was calling from someone else's phone, and when the operator asked if he could provide a different number he changed the subject and continued discussing the suspect's location. *Id.* Mr. Domingis made a second call to 911, again identifying himself and confirming the suspect's location (though he was

almost a mile and a half away), but the police who conducted a *Terry* stop of the suspect did not know about the second call. *Id.* at 1173–74. When the suspect was patted down, a loaded .45 caliber semi-automatic handgun fell to the ground. *Id.* at 1174. The suspect moved to suppress evidence obtained from the *Terry* stop on the grounds that Mr. Domingis's call was an anonymous tip that did not furnish police with the requisite reasonable suspicion. *Id.* The Ninth Circuit rejected this argument, finding that the 911 call demonstrated sufficient indicia of reliability. The caller had identified himself and police had evidence of the 911 call (the recording and transcription). *Id.* at 1174–75. The Ninth Circuit also noted that "Mr. Domingis's 911 call prior to the *Terry* stop was entitled to greater reliability than a tip concerning general criminality because the police must take 911 emergency calls seriously and respond with dispatch," and Mr. Domingis reported that the suspect had just threatened him with a firearm—indicating both a potential crime and a physical treat to himself. *Id.* at 1176. The Court noted that Mr. Domingis risked any anonymity he might have enjoyed and exposed himself to legal sanction by identifying himself in the call. *Id.* Finally, the Court found additional indicia of reliability because "his call evidenced first-hand information from a crime victim laboring under the stress of recent excitement." *Id.* The Court concluded that the police reasonably relied on Mr. Domingis's tip. *Id.* at 1177.

Here, the 911 call, coupled with the officers' observations at the caller's residence, provided the reasonable suspicion necessary to conduct a *Terry* stop. The 911 call bore many of the indicia of reliability laid out in *Navarette* and *Terry-Crespo*. As an initial matter, as in *Terry-Crespo*, 356 F.3d at 1174–75, the 911 call was recorded and transcribed. (Tenley Decl. Exs. 1, 1-A.) The caller also provided a name and telephone number. (Tenley Decl. Ex. 1-A at 2:1–4.) Although it appears that she provided a false name, her telephone number was correct. *See supra* note 1. Defendant claims that the number was "disconnected and unanswerable," (Dkt. 50 ["Reply"] at 4), but the evidence shows that the caller hung up, and when the 911 operator called back, she

received a voicemail message repeating the same telephone number the caller had provided, indicating that the caller simply did not pick up. (Tenley Decl. Ex. 1-A at 3:23–4:3.) The fact that she provided the correct phone number "narrows the likely class of informants by providing identifying information during the recorded 911 call," *Terry-Crespo*, 356 F.3d at 1171, and as *Navarette* and *Terry-Crespo* explain, it exposes her to substantial liability in the event of a false report, lessening the likelihood that she was not telling the truth, *id.* at 1176; *Navarette*, 134 S. Ct. at 1689. That the police could not locate the caller upon arrival at the scene, (Reply at 5), is also immaterial.[6] *See Terry-Crespo*, 365 F.3d at 1175 (rejecting such an argument).

The caller also provided a description of the suspect and his car, along with his name and the fact that he was her 36 year old ex-boyfriend. (Tenley Decl. Ex. 1-A at 2:7–15.) This level of detail about the suspect, and the indication that the caller knew him personally, is further evidence of reliability. LAPD also used a helicopter to confirm that an individual matching the suspect's description and the Camaro were near the caller's reported address before he was stopped. (Tenley Decl. Ex. 1-A at 3:19, 4:4.) That Defendant was in his car, rather than the backyard of the house, (Reply at 5), is immaterial because he was still in close proximity to the location reported on the 911 call—in *Navarette* the police found the suspect truck *nineteen miles* from the caller's reported location. *Navarette*, 134 S. Ct. at 1689.

Most importantly, the caller was reporting eyewitness knowledge of an immediate and serious danger—that a man was at her back door with a gun. (Tenley Decl. Ex. 1-A at 1:8–9.) That the caller did not provide "specific criminal allegations," (Reply at 5), is

---

[6] Based on the evidence cited in note 1, *supra*, the Government believes that Jonhesha White and Defendant were involved in a domestic dispute during which Defendant used a handgun, and White called 911. (Opp. at 14.) When the police responded, White most likely lied about the incident in an attempt to protect Defendant. (*See id.*) In light of the evidence before the Court, this is the most reasonable and likely explanation of the incident.

immaterial because she was clearly communicating that she was in immediate danger of deadly harm, which the police must take seriously. *Terry-Crespo*, 356 F.3d at 1176. In the background of the call, someone even asked "Who's that n***** with a gun?" (Tenley Decl. Ex. 1-A at 3:15–23.) This is stronger evidence of reliability than that present in *Navarette* and *Terry-Crespo*, because here the report of danger was contemporaneous. *Cf. Navarette*, 134 S. Ct. at 1689; *Terry-Crespo*, 356 F.3d at 1176. The caller was also frantic, evident not only from the tone of her voice but also from her repeated pleas that the police "hurry." (Tenley Decl. Ex. 1; *id.* Ex. 1-A at 1:24–25, 2:7–15, 2:21–3:12.) The totality of circumstances strongly indicated the presence of a continuing crime (domestic violence) and danger to the caller. The police had the reasonable suspicion necessary to conduct an investigative stop and frisk Defendant for weapons.

Defendant improperly attempts to compare this case to *Florida v. J.L.*, 529 U.S. 266 (2000). (Mot. at 10–11; Reply at 6.) In that case, "an anonymous caller reported to the Miami–Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *J.L.*, 529 U.S. at 268. The Court found that the tip on its own did not provide reasonable suspicion for a *Terry* stop and frisk. *Id.* In that case, however, the tipster had called the police department, not 911. *Id.* There was no evidence of the call such as a recording or other notes, and the informant provided no identifying information about himself. *Id.* at 268–69. Nor did the call contain any indication of an impending or ongoing threat of criminal activity or danger. *Id.* Simply put, this case is nothing like *J.L.*

**C. Protective Sweep of Automobile**

Defendant argues that even if reasonable suspicion justified a stop and frisk, the reasonable suspicion "dissipated" after the police did not find a gun on Defendant's

person. (Mot. at 13; Reply at 7.) However, as the Supreme Court explained in *Michigan v. Long*, 463 U.S. 1032 (1983), "suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed." *Id.* at 1048. *Long* applied *Terry's* reasoning in holding that "the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* at 1049–50 (quoting *Terry*, 392 U.S. at 21).

Here, the police had a reasonable belief that Defendant was associated with the Camaro and could easily access a weapon from it. At that point he was not yet formally arrested[7] and therefore would have accessed the car upon release. *See Long*, 463 U.S. at 1051–52 ("The Michigan Supreme Court appeared to believe that it was not reasonable for the officers to fear that Long could injure them, because he was effectively under their control during the investigative stop and could not get access to any weapons that might have been located in the automobile. This reasoning is mistaken in several respects. During any investigative detention, the suspect is 'in the control' of the officers in the sense that he 'may be briefly detained against his will' . . . . Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from

---

[7] *See Alexander v. Cty. of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995) ("Having established that the officers had reasonable articulable suspicion to stop the plaintiffs, we next consider whether under clearly established law, a reasonable officer should have known that stopping these men at gunpoint, handcuffing them, and detaining them in a patrol car for a witness identification was unlawful. It is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable. . . . In addition, 'there is no per se rule that detention in a patrol car constitutes an arrest.'").

1 police control and retrieve a weapon from his automobile.  In addition, if the suspect is
2 not placed under arrest, he will be permitted to reenter his automobile, and he will then
3 have access to any weapons inside.  Or, as here, the suspect may be permitted to reenter
4 the vehicle before the Terry investigation is over, and again, may have access to
5 weapons."); *see also United States v. Morris*, 417 Fed. App'x 713, 714–15 (9th Cir.
6 2011) (search of defendant's igloo cooler permissible under *Terry* even though defendant
7 was already handcuffed and sitting in police car.); *United States v. Wallen*, 388 F.3d 161,
8 166 (5th Cir. 2004) ("First, the court was incorrect in finding that the protective search
9 was invalid because Miers had already placed Wallen in handcuffs.  This finding
10 misunderstands the nature of the protective search; the fear of a person's gaining
11 immediate control of weapons does not limit itself to the time of the stop, but extends
12 through the entire interaction between him and the officer.").

14      Additionally, the 911 call specifically linked Defendant to the Camaro.  (Tenley
15 Decl. Ex. 1-A at 1:20–21.)  When the LAPD helicopter arrived and the officer inside it
16 corroborated the information provided in the 911 call, he specifically noted that
17 Defendant was getting in and out of the driver's seat of the Camaro.  (Delgadillo Decl. ¶
18 6.)  And when Officers Delgadillo and Dixon arrived on the scene, Defendant was sitting
19 in the driver's seat of the Camaro.  (*Id.* ¶ 7.)  It was reasonable for them to suspect that he
20 hid a gun in the car before getting out of it—especially because the noise from the
21 helicopter and the fact that Delgadillo and Dixon had arrived with their sirens blaring
22 would alert Defendant to the officers' arrival ahead of time.  (Tenley Decl. Ex. 10.)  From
23 their own experience and training, Officers Delgadillo and Puche knew that armed
24 suspects frequently conceal weapons inside vehicles, including in hidden areas such as
25 the space behind the glove box.  (Delgadillo Decl. ¶ 10; Puche Decl. ¶ 6.)  Although
26 Defendant is correct that an investigatory stop cannot continue indefinitely, (Mot. at 12),
27 any reasonably prudent officer in the present situation would have swept the car for the
28 safety of themselves and those around them before determining that the area was secure.

Reasonable suspicion did not dissipate simply because they did not find a gun on Defendant's person.  Thus, as in *Long*, "the officers did not act unreasonably in taking preventive measures to ensure that there were no other weapons within [Defendant's] immediate grasp before permitting him to reenter his automobile." *Long*, 463 U.S. at 1051.

**IV.  CONCLUSION**

For the foregoing reasons, Defendant's motion to suppress evidence is DENIED.

DATED:     February 10, 2017

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE