# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> GLENN DESHAWN BROWNE, <br><br> Defendant. | Case No.: SACR 16-00139-CJC <br><br> **ORDER DENYING DEFENDANT'S MOTION FOR A NEW TRIAL** |

On March 9, 2017, after a seven-day jury trial, Defendant Glenn Deshawn Browne was convicted of one count of conspiracy to receive, possess, conceal, store, sell, or dispose of stolen firearms in violation of 18 U.S.C. § 371, two counts of receipt, possession, concealment, storage, sale, or disposal of stolen firearms in violation of 18 U.S.C. § 922(j), and one count of unlawful possession of a firearm and ammunition by a felon in violation of 18 U.S.C. § 922(g)(1). Defendant now moves for a new trial pursuant to Federal Rule of Criminal Procedure 33 on the grounds of purported

misconduct by the government's case agent, ineffective confrontation and cross-examination, the Court's failure to instruct the jury on "multiple conspiracies or the buyer-seller rule," and ineffective assistance of counsel. (Dkt. 115 [Motion, hereinafter "Mot."].)

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for a new trial is "directed to the discretion of the district judge," and should be granted "only in exceptional cases," *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981), such as where "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred," *United States v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992). For the foregoing reasons, Defendant's motion is DENIED.

*1. Case Agent Misconduct*

Defendant's motion focuses on the purported misconduct of the government's case agent, Ryan Stearman, during cross-examination at trial. (*See generally* Mot.) "To prevail on a motion for new trial based on prosecutorial misconduct, a defendant must show that the conduct more probably than not materially affected the fairness of the trial." *United States v. Atcheson*, 94 F.3d 1237, 1244 (9th Cir. 1996), *as amended on denial of reh'g* (Oct. 3, 1996). None of Agent Stearman's actions constituted misconduct nor did they materially affect the fairness of the trial.

First, Defendant argues that Agent Stearman had a "constant and consistent impulse to answer the questions Stearman wanted to answer instead of the questions his examiner wanted answered." (Mot. at 11.) Defendant claims that during the suppression

hearing held prior to trial on February 10, 2017, Defense counsel was "attempting to establish standing by crediting Stearman with the foundation for his expert opinion regarding standing," when Agent Stearman "volunteer[ed], non-responsively, that [Los Angeles Police Department, or 'LAPD'] officers would be better able to testify to the contents of their reports when any marginally competent law enforcement officer would have known that counsel was 100% uninterested in the contents of any LAPD report." (*Id.*) Agent Stearman made a comment to this effect three times during the hearing. (Dkt. 71 at 7:15–18, 10:1–3, 10:18–21.) In all three instances, Defense counsel asked Agent Stearman about his personal understanding of the circumstances surrounding Defendant's arrest, which the agent fully answered *before* stating LAPD might provide better information. (*See, e.g.*, *id.* at 7:15–18 ("It was my understanding that Mr. Browne was in or around the vehicle. I can review the report again to tell you what Officer Delgadillo reported in his report, but that may be better suited for Officer Delgadillo to report on.").) These remarks do not evidence a "constant and continuous habit of delivering non-responsive and evasive answers to properly framed questions," (Mot. at 12), but rather demonstrated a desire to provide accurate information. Additionally, Agent Stearman provided these responses at the *suppression* hearing, not the trial. It is therefore not plausible that these off-hand statements at the suppression hearing could in any way materially affect the fairness of the trial.[1]

---

[1] Defense counsel's personal impressions of Agent Stearman and the police officers involved in Defendant's arrest have no bearing on the fairness of the trial. (*See* Mot. at 11 ("[D]uring Stearman's testimony, counsel observed a glibness and superficial charm, a high estimation of self, a need for stimulation, and shallow affect."); *id.* at 11–12 ("Counsel has confronted many white cops like Stearman who dress up in coats and ties and present an attitude and demeanor to the jury that's inconsistent with the attitude and demeanor they present to the public on the streets. Counsel is also aware that these white cops like Stearman resent any form of cross-examination control because the courtroom environment is inconsistent with the street environment within which they enjoy absolute power and control over the citizens they are charged with serving and protecting.").) For the record, however, the Court does not share Defense counsel's personal impressions of Agent Stearman and the police officers. The Court found Agent Stearman and the police officers to be credible and unbiased witnesses.

In his reply brief, Defendant is also critical of many of the responses Agent Stearman gave to Defense counsel's questions during cross-examination, but most of Agent Stearman's responses evidence either a desire on his part to be precise or understandable confusion about the questions that he was being asked. (*See, e.g.*, Reply at 10 (citing Dkt. 118 at 69:6–15 ("Q: Okay. So during the entire conversation you had with her in connection with the gun burglary from ExaTactical, she was telling you that an innocent person by the name of Lexi was involved in that particular crime? A: She never said an innocent person by the name of Lexi. She named a person named Lexi. And then through a review of her cellular telephone, I found text messages indicating that a person Lexi appeared to have been planned to be involved in the burglary, and it never came to fruition that that person showed up.")); *id.* at 11 (citing Dkt. 118 at 34:11–22 ("Q: Did the defendant provide any explanation for why he had two forms of identification on his person? A: He stated something to me to the effect of he had it—he had Mr. Smith's identification so that he could use it with law enforcement if he—to avoid any outstanding warrants. Q: Did the defendant say anything about the woman in the car? A: Yes. Q: What did he say? A: Stated that her name was Zakiyah, and I believe he stated the car was registered to her; however, the car was not registered to her.")); *id.* at 16 (citing Dkt. 118 at 93:14–17 ("Q: Are you familiar with the definition of a criminal street gang? A: As it pertains to the California Penal Code, I could not cite it to you verbatim, no.")); *id.* at 20 (citing Dkt. 130 at 33:9–21 ("Q: Is that Jonhesha White? A: Does not appear to be. Q: How about Kiyah Williams (sic)? We talked about her. A: Zakiyah Williams? Q: Well, she goes by 'Zakiyah.' That's her full name, but a lot of times it appears that she's identifying herself as 'Kiyah,' which I assume is short for 'Zakiyah'; is that correct? A: I don't know if that's correct. Q: Okay. How did she identify herself to you? A: To tell you the truth, I'm not even sure who I've talked to at this point, whether it's Jonhesha White, or Zakiyah Williams.")).)

Defendant's accusations that Agent Stearman purposefully forced Defense counsel "to object multiple times in front of the jury" regarding his non-responsiveness and that the prosecution "put out a toxic message via the answer and forced the [D]efense counsel to look like an obstructionist with repeated objections" are baseless and not true. (*See* Dkt. 132 ["Reply"] at 7–8, 10.) While the Court did instruct Agent Stearman to provide simple 'yes' or 'no' answers, that was to streamline proceedings and avoid repetitive questioning by Defense counsel, not because Agent Stearman was engaging in misconduct or purposefully thwarting cross-examination. (Dkt. 118 at 98:9–15 ("Agent, I want to make sure that we get through this testimony in the most efficient way possible, so I'm going to ask you, when Mr. Harley asks you a question, please try to be as responsive as you can to his question. And if Mr. Tenley wants to follow up and ask for an explanation, he'll do it on redirect. But we'll be here a long time if you go beyond a simple 'yes' or 'no' to his question.").) The exchange between Defense counsel and Agent Stearman occasionally became heated, but usually because the agent was expressing frustration regarding argumentative and repetitive questioning,[2] and the Court advised Defense counsel as such. (Dkt. 130 at 103:16–21 ("If a witness is not being responsive, then I have to admonish the witness. But what I'm saying in fairness to him, I think he is trying to respond to your questions. Yes, you are frustrating him. You're frustrating [the prosecutor]. And to a much lesser degree, you're frustrating me, because

---

[2] For example, when Defense counsel asked Agent Stearman "Could [sic] be somebody who has never been convicted of any type of crime before or somebody who approaches [CW's] criminal history, you're always going to remind them of the important factors to tell the truth?" Agent Stearman provided the example of his conduct concerning a "Mr. Foster." After Defense counsel asked him repeatedly why he picked Mr. Foster as an example, he responded "I don't know, Mr. Harley. I apologize if my selection didn't please you." (*Id.* at 12 (citing Dkt. 118 at 85:5–87:25); *see also* (*id.* at 19 (citing Dkt. 130 at 20:24–21:6 ("Q: And you can see he's wearing the same type of shirt as well as what appears to be a gold necklace, correct? A: Mr. Harley, I'll state for the third time, I don't believe that's the same shirt. My eyesight could be fooling me, but it appears to be the face of an individual right here (indicating) and, like, a mustache and a nose. Like I said, for sake of simplicity, I'll agree with you that's the same shirt if that helps.")).) The Court expressed frustration that both Agent Stearman and Defense counsel were "arguing with one another over minutia and details," but never suggested that the agent was engaging in misconduct—in fact, the Court notified Defense counsel that Agent Stearman was "feeling you're harassing him and trying to put words in his mouth." (Dkt. 130 at 94:1–95:1.)

I'm worried about the jury. . . . And a lot of the points you're making, I get it. And some of the points you're making, I think are very valid, good points. I hear you. But make your point. And if you want to reinforce your point, that's okay, but let's not do it three or four or five times. That's the problem I'm having.").)

Defendant also argues that Agent Stearman "non-responsively accused [Defense] counsel of demeaning him while exercising [D]efendant's constitutional right to confront and cross-examine the witnesses against him." (Mot. at 12.) Defendant is referring to the following exchange between Defense counsel and Agent Stearman, which occurred after several hours of cross-examination:

> Q: Do you have an independent recollection without basing your report—is that what happened when you're talking to her on November 8th?
> A: Not without referring to my report.
> Q: Okay. And you've already referred to your report, and I thought that helps you remember, right?
> A: Yes.
> Q: We've talked about the procedure if you don't remember anything, because we anticipated you would have to refresh your recollection so many times you don't even have to ask the Court's permission, right?
> A: Yes.
> Q: And I just saw you trying to refresh your recollection and then you looked up at me, right? Right?
> A: Yes.
> Q: And that's the procedure you've gone through before. Once you look down and read the report and if it refreshes your recollection, then you look up at the person and ask—are you looking over at the Judge for some reason? I just saw you looking across (sic) the Judge.

A: I found the line of questioning demeaning, but you've—I'm listening.

(Dkt. 130 at 92:9–93:6.) Agent Stearman's statement does not amount to misconduct. Defense counsel's question as to why Agent Stearman was looking at the judge was argumentative and demeaning. The agent gave a truthful and responsive answer to the question. Although Agent Stearman's response did not prejudice Defendant's ability to exercise his right to cross-examination, out of an abundance of caution, the Court also gave a limiting instruction regarding this exchange. (*Id.* at 105:2–106:8 ("You did hear Agent Stearman say he found Mr. Harley's questions demeaning. I'm going to strike the Agent's statement about Mr. Harley's questions, as it is irrelevant to your decision. Please do not discuss or consider this statement during your deliberations. And one of the instructions I believe I gave you at the beginning of the case—and I'll give it to you again at the end—is: Questions, statements, objections and arguments by the lawyers are not evidence. The lawyers are not witnesses. Although you must consider a lawyer's questions to understand the answers of a witness, the lawyer's questions are not evidence.").) The Supreme Court "presumes that jurors, conscious of the gravity of their task, attend closely to the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). Agent Stearman's statement "I found the line of questioning demeaning" did not materially affect the fairness of the trial.

Defendant also argues that "Stearman's unwarranted interjection of [D]efendant's membership in the Rolling 30s criminal street gang is equally troubling given the long established prejudicial nature of gangs recently articulated by the Ninth Circuit." (Mot. at 12.) Again, Defendant is referencing statements by Agent Stearman that were directly solicited by Defense counsel. After extensive pre-trial discussions, the Court had ordered the government not to elicit any gang-related testimony in its direct examinations of witnesses, which the government honored. However, the Court also warned Defense

counsel that if he opened to door to gang affiliation during cross-examination, the government would be permitted to admit evidence to that effect. During cross-examination of Agent Stearman, Defense counsel published a photograph of Defendant and the Cooperating Witness ("CW") making hand gestures. The following exchange then took place between Defense counsel and Agent Stearman regarding the photograph:

> Q: Moving on to the right, you see—I don't—kind of an average looking guy with his fingers up like that?
> A: Yes, sir, I see your client.
> Q: Okay. That was my next question, and go for it. Okay. And it looks like he's flashing something like a peace sign?
> A: Are you asking my opinion on what he's flashing? Because I would not agree with that.
> Q: Okay. So in your opinion, what type of sign is he flashing up there?
> A: It appears to be a "W" or a three.
> Q: Oh, okay. And is that a "W" connected up in any way, shape, or form to Kory White Dogg?
> A: That was not what was explained to me.
> Q: And you got an explanation from whom?
> A: [CW].
> Q: Okay. Her explanation was it had really nothing to do with Kory White Dogg?
> A: Her explanation that it was a symbol representing the defendant's gang neighborhood.
> Q: Okay. And did you ever verify that information by going out and trying to identify whether or not that symbol that you described as a "W" was specifically put up there in connection with a gang sign as opposed to throwing a "W" up there representing Mr. White Dogg in the rap culture?

| | | |
|---|---|---|
| 1 | A: | I was able to confirm that the defendant is a documented Rollin' 30s gang |
| 2 | | member, so it was consistent with [CW] telling me that it was representative |
| 3 | | of the 30s, as I believe it's documented in the report. |
| 4 | Q: | Okay. And my question to you, you did actually follow up and determine it |
| 5 | | was Mr. Glenn Browne's gang, or was it his brother's association with the |
| 6 | | gang? |
| 7 | A: | I believe his brother may have been associated with the gang, too, but I |
| 8 | | confirmed that Mr. Browne is associated with the Rollin' 30s. |

(Dkt. 118 at 90:20–92:3.) Defense counsel chose to publish a picture of Defendant flashing a hand gesture that could be interpreted as a gang sign, (*see* Dkt. 124-1 [hereinafter "Tenley Decl."] at Ex. 5 (Trial Ex. 82)), and Defense counsel opened the door to such evidence by asking Agent Stearman "what type of sign" it was. The agent was reluctant to explain what he thought the sign meant and asked for clarification because he did not agree with Defense counsel's characterization of the sign. He did not say that he believed the sign was a gang symbol until Defense counsel pressed him further. Accordingly, Agent Stearman's statements were responsive, and they did not amount to misconduct because Defense counsel opened the door to gang evidence. And again, the Court again gave a limiting instruction regarding Agent Stearman's response out of an abundance of caution. (Dkt. 105 at 20 ("The issue of gang membership or association is not relevant to the defendant's guilt or innocence of the crimes for which he is on trial. Therefore, you must not discuss or consider this issue during your deliberations.").

Nor is Defendant correct that Agent Stearman's opinion regarding Defendant's gang affiliation had "no foundational support," (Mot. at 16), since Agent Stearman clearly explained the basis for his belief: CW (who was also in the photograph) told him of the meaning of the hand gesture, LAPD informed him that Defendant was a member of

the Rollin' 30s Harlem Crips gang, and Agent Stearman observed Defendant's gang-related tattoos.3 (Dkt. 118 at 91:7–93:1; Tenley Decl. Ex. 6.) Defense counsel also was permitted to, and did, ask Agent Stearman numerous questions in front of the jury about the credibility of these sources of information and the reliability of Agent Stearman's investigation regarding gang affiliation, (*id.* at 91:14–93:12), so Defendant's complaint that Agent Stearman did not "document" any of his conversations regarding Defendant's gang affiliation is also insufficient to show prejudice, (*see* Reply at 13–14).

Defendant argues that Agent Stearman's "deficient character for truth telling" was also evident because at trial he avoided answering questions about "whether or not he told [CW] that no promises were made in response to [CW's] specific request that her cooperation would 'benefit her in some type of way.'" (Mot. at 13.) Defendant is referring to Agent Stearman's testimony regarding his summary report of a post-arrest interview with CW on November 8, 2015, which stated "At 0338 hours, [CW] inquired if any information she provided would 'benefit her in some type of way.' SA Stearman advised that any assistance or material information [CW] provided would be considered but no promises were made." (Tenley Decl. Ex. 7.) At trial, Defense counsel spent considerable time questioning Agent Stearman about this report, and *repeatedly* asked him whether he uttered the specific phrase "no promises" to CW. (Dkt. 130 at 67:7–81:22.) Agent Stearman consistently explained that the report means that he did not in fact make any promises to CW, not that he specifically uttered verbatim the words "no

---

3 Regarding Defendant's tattoos, Agent Stearman stated "I've seen of your client that had '30' tattooed on the back of his arms," which in part informed Agent Stearman's belief that Defendant was a member of the Rollin' 30s street gang. (Dkt. 118 at 93:11–12.) Defendant argues that this statement is misleading because there "is a '3' tattooed on the back of [D]efendant's left arm and a '0' tattooed on the back of Defendant's right arm." (Reply at 15.) Agent Stearman's testimony is an accurate characterization, especially since he stated that the tattoo was on the "*back* of his arms," and not the "*backs* of his arms." A review of the photograph of Defendant's tattoo indicates that it is eminently reasonable to conclude that the "3" tattoo and the "0" tattoo were meant to be read together, especially since they are the same size and font and are oriented the same way. (*See* Tenley Decl. Ex. 6.)

promises."[4] Defense counsel also threatened to play the recording of the interview between Agent Stearman and CW, and the agent encouraged him to do so several times, but Defense counsel never did so. (Dkt. 130 at 69:22–23, 70:1–2, 71:13–15, 71:20–22, 72: 16–18, 73:3–4, 79:10–12.)

Defendant claims that he had "rock solid evidence" to attack Agent Stearman's credibility, in that he wanted to present evidence "through his investigator that Stearman never made any such statement regarding no promises," but "apparently, the Court precluded such credibility attack pursuant to [Federal Rule of Evidence] 608(b)."[5] (Mot. at 13.) This argument is unavailing for several reasons. First, Agent Stearman

---

[4] *See, e.g.*, Dkt. 130 at 67:12–15 ("Q: And it's your testimony today that the word 'no promises' were being made actually came out of your mouth. Is that your testimony? A: That's not my testimony."); *id.* at 69:16–17 ("I did not tell her that verbatim statement. That's why it's not in quotes."); *id.* at 69:19–23 (Q: "My next question is: Did the word 'promise' in response to her question for benefit, did that word come out of your mouth while you're answering her that question? A: No, I don't believe it did. I can listen to the recording, if you'd like."); *id.* at 70:15–22 ("Sir, I said, something in summary of—that anything she did would be considered, but I made her no promises that she was going to get a lighter sentence, or that she was not going to be charged. That's why I put in my report that the following was a synopsis of the interview and any time I actually used the quotes around words, it was quoting language that was used in the interview and it accompanied a recording."); *id.* at 71:7–15 ("Q: Didn't you just answer the question the Judge put to you, using the word 'promises,' reflecting that's what you told in summary and in substance to [CW] when she's asking for a benefit? Didn't you just use the word 'promises' in your answer to when the Judge asked you the question? A: Yes, I said that's a summary of what I said to her. If you [sic] like to know specifically what I said to her, Mr. Harley, we can play the recording."); *id.* at 71:23–72:18 ("Q: So, right now, I'm asking, specifically, do you know the jury (sic), the word 'promise' never came out of your mouth when you're describing to [CW] you couldn't promise anything. . . . A: I did not use the verbatim word 'promise.' Q: Okay. Okay. And I'm asking, did you ever use a word 'promise' or synonymous with the word 'promise' when you were telling her about no promises were being made? A: I'm getting confused here, Mr. Harley. I explained in summary what I told her. If you want a verbatim— Q: I know. Go ahead. Finish the answer. A: If you want a verbatim recollection of what I said or a verbatim record of what I said to her, I think the best thing to do at this point is play the audio recording."); *id.* at 81:10–18 ("Q: And when you reviewed it just a couple of days ago, the complete recording, did you hear anything coming out of you or Parent's mouth indicating that either one of you told her no promises were being made? A: Those exact words, no. Q: Just an approximate response which included the word 'promise'? A: That included the word 'promise,' no, I do not believe so. Q: Okay. So you're not certain, but you believe there's absolutely no mention of the word 'promise' in response to her question put to you? That's your best belief? A: That's my—yes.").

[5] To the extent Defendant is arguing that Stearman committed perjury or withheld exculpatory evidence, (*see* Mot. at 5), such argument is baseless and without any support in the record.

consistently testified that he did not utter the words "no promises" verbatim, despite Defense counsel's repeated attempts to extract a different response from him, so there was nothing to impeach Agent Stearman about. Second, Defense counsel could have played the recording of Agent Stearman's interview with CW while the agent was on the stand, which Agent Stearman encouraged and the Court would have permitted, but Defense counsel chose not to play it despite numerous opportunities to do so. Third, the testimony of Defense counsel's investigator regarding the contents of the recording is cumulative evidence, improper hearsay, and violative of the best evidence rule. The Court did not err by preventing Defense counsel from calling his investigator to the stand to testify about the contents of the recording.

In sum, while Defense counsel and Agent Stearman had some contentious exchanges during cross-examination, and the agent occasionally offered more than he was asked out of a desire to be precise or as a result of confusion or frustration with argumentative and repetitive questioning by Defense Counsel, Agent Stearman's statements did not constitute, and were nowhere close to constituting, prosecutorial misconduct.

*2. Confrontation Clause*

Defendant argues that Agent Stearman's actions "denigrated" Defense counsel and Defendant's constitutional right to cross-examination, "rendering his confrontation and cross-examination meaningless." (Mot. at 7.) "The right to confront witness includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias or self-interest in testifying." *United States v. Payne*, 944 F.2d 1458, 1469 (9th Cir. 1991). "The right is not unlimited, however, and a trial judge retains wide discretion in limiting the scope of cross-examination." *Id.* The "Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is

effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original).

To the extent Defendant is arguing that Agent Stearman's supposed misconduct prevented meaningful cross-examination, this argument is unavailing since the Court has already determined that there was no such misconduct. Additionally, Defense counsel had ample to time to, and did, effectively cross-examine every witness. For example, Defense counsel cross-examined CW for more than three hours, wherein he spent considerable time admitting evidence and developing the record concerning her past criminal convictions and her purported "crime spree" between May and November 2015, impeaching her about her motivation to testify against Defendant, and depicting her as an unreliable witness. Defense counsel cross-examined Agent Stearman for almost four hours regarding his investigations, handling of evidence, interactions with CW, credibility, the strength of his recollection, and potential biases. For each witness, the Court did not end Defense counsel's cross-examination until it became excessively cumulative and argumentative, at which time the Court was well within its authority to restrain the questioning pursuant to Federal Rule of Evidence 611(a). There is no basis for Defendant to assert that his Confrontation Clause rights were violated.

*3. Failure to Instruct*

Defendant also argues that the Court erred in failing to instruct on "multiple conspiracies and a buyer-seller relationship." (Mot. at 18.) "The formulation of jury instructions is within the discretion of the trial court." *Gracie v. Gracie*, 217 F.3d 1060, 1067 (9th Cir. 2000). "In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation. A single instruction to a jury may not be judged in artificial isolation, but must be viewed in

the context of the overall charge." *United States v. Dixon*, 201 F.3d 1223, 1230 (9th Cir. 2000) (internal citation omitted).

As an initial matter, Defense counsel did not request either instruction at trial. *United States v. Lara-Hernandez*, 588 F.2d 272, 274 (9th Cir. 1978) ("The presentation of additional evidentiary theories for the first time after the jury has returned its verdict does not comport with the salutary purpose of the timeliness requirement to allow the trial judge to make an informed ruling based on the issues as framed by the parties before the evidence is either introduced or excluded from the pertinent stage of the trial.").

Additionally, the requested instruction regarding multiple conspiracies had no application in this case. "Evidence sufficient to support a multiple conspiracies instruction is present where a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment." *United States v. Mincoff*, 574 F.3d 1186, 1196 (9th Cir. 2009). Here, the indictment only alleged one conspiracy to sell stolen firearms between Defendant and CW, and the evidence presented at trial revealed only that one conspiracy. To the extent Defendant is referring to his lack of involvement in *stealing* the firearms, this is irrelevant. The government's case never connected Defendant to the initial stealing of the firearms, and Defendant stood trial alone, so there was no risk of "spillover" of guilt regarding those individuals who stole the firearms at issue. *United States v. Liu*, 631 F.3d 993, 1000 (9th Cir. 2011) ("A multiple conspiracy instruction is not required when a defendant 'stands trial alone' because 'there is no problem of spillover.'") (quoting *United States v. Anguiano*, 873 F.2d 1314, 1317–18 (9th Cir. 1989).

Nor was Defendant entitled to a "buyer-seller" instruction that "mere sales to other individuals do not establish a conspiracy to distribute or possess with the intent to distribute" and that "conspiracy requires proof of an agreement to commit a crime other

-14-

than the crime that consists of the sale itself." *United States v. Hays*,—Fed. Appx. —, No. 15-50181, 2016 WL 7367843, at *1 (9th Cir. Dec. 20, 2016). Here, the jury was properly instructed on the elements of a conspiracy. (Dkt. 105 at 21–22 ("A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed. . . . It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit. . . . One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of the details of the conspiracy.").) Substantial evidence supported the existence of a conspiracy between Defendant and CW—the government's case did not rest on the mere sale of firearms between CW and Kory White (also known as "White Dogg"). CW testified that on August 30, 2015, she met with Defendant, told him that she had stolen firearms that she wanted to sell, and asked Defendant if he knew anyone who would be interested. As a result, Defendant introduced her to White, a potential buyer. On August 31, 2015, Defendant drove CW to White's residence so that she could complete the sale of the stolen firearms. CW testified that Defendant concealed the firearms in a blanket and carried them from his car to White's apartment. Defendant also kept one of the stolen firearms, a Glock pistol, for himself—the same one he possessed when he was later arrested on August 20, 2016. DNA consistent with Defendant's DNA was found on the trigger and trigger guard of the Glock pistol. The following month, Defendant and CW exchanged several text messages regarding the payment of $250, which CW testified was the money Defendant owed her for the firearm Defendant kept for himself when they visited White's residence. Contrary to Defendant's belated criticism, no buyer-seller instruction was necessary.

*4. Ineffective Assistance of Counsel*

A claim for ineffective assistance of counsel requires a defendant to demonstrate that "his counsel's performance was so deficient that it fell below an 'objective standard of reasonableness'" and that "the deficient performance prejudiced the defense and made the trial results unreliable." *Hensley v. Crist*, 67 F.3d 181, 185 (9th Cir. 1995). Defendant's notice of motion argues that he received ineffective assistance of counsel due to "failure of [D]efense counsel to competently establish (a) standing for purposes of asserting defendant's Fourth Amendment rights; [and] (b) failure to present exculpatory evidence from Cydney Clayborn, Kory White's girlfriend, and a percipient witness that no gun transactions between White, CW and Browne ever occurred in the area of White's apartment on or about August 31, 2015,"[6] but provides no argument or evidence to this effect. (*See* Dkt. 115 at Notice of Motion.)

Regarding standing, the Court already determined in connection with Defendant's earlier suppression motion that Defendant lacked standing to challenge the search of the car he was found in at the time of his arrest. (Dkt. 57 at 5–8.) After an evidentiary hearing, the Court found that Defendant did not have the requisite possessory interest in the car because he did not own it and did not establish that he had permission to use it. (*See id.*) There is no indication that any evidence elicited at trial could have altered the Court's decision. Moreover, this purported failure on the part of Defense counsel to establish standing did not prejudice Defendant, because the Court proceeded to the merits of Defendant's suppression motion as an alternative basis to deny the motion. (*Id.* at 8 n.5.)

---

[6] Defendant's notice of motion also asserts that Defense counsel's failure to request an instruction regarding "multiple conspiracies" constitutes ineffective assistance of counsel. (Dkt. 115 at Notice of Motion.) This is unavailing since, as explained above, such instructions were not warranted based on the evidence presented at trial.

Nor has Defendant demonstrated that Cydney Clayborn would have provided exculpatory evidence such that Defendant was prejudiced as a result of counsel's failure to call her. The reasons for this failure are unclear. During trial, Defense counsel had informed the government that Clayborn could be called as a witness, but apparently efforts to issue a trial subpoena had been unsuccessful. (Dkt. 124 at 3 n.2.) In any event, at trial, CW testified that Clayborn helped her, Defendant, and White with the stolen firearms transaction at White's residence by bringing extra blankets to conceal the firearms as they were carried from Defendant's car to White's residence. (Dkt. 117 at 13:6–14:13.) The government points out that records of telephone calls between White and Clayborn around that time corroborate CW's testimony regarding Clayborn, (Dkt. 118 at 54:21–55:25, 56:15–58:17; Trial Ex. 111), so Clayborn would have been "well within her rights to assert her Fifth Amendment privilege" at trial, just as White did, (Dkt. 124 at 6). If Clayborn did testify, she "would have been subject to powerful impeachment evidence," because "[w]hen White Dogg was arrested on December 8, 2015, Clayborn admitted to ATF agents that an associate of White Dogg had instructed her to enter his apartment before law enforcement began searching it and to destroy incriminating evidence inside, which was attempted to do, but was blocked by ATF agents." (*Id.* (citing Tenley Decl. Ex. 1).) Accordingly, Defendant has not established that Clayborn's testimony would have materially affected the verdict, particularly in light of the substantial evidence of Defendant's guilt, more fully described in the Court's order denying Defendant's accompanying motion for a judgment of acquittal.

Finally, Defendant argues that because of Agent "Stearman's painful cross-examination," Defense counsel decided not to examine Agent Stearman about his potential racial bias, because "one of the quickest ways to shut down any meaningful dialogue between citizens on race is to accuse the other side of being a racist" and "one of the quickest ways to shut down any meaningful dialogue between jurors on race is to accuse the defense of 'introducing the race card.'" (Mot. at 14–15.) However, Defendant

claims that this decision "was not sound nor was it tactical." (*Id.* at 14–15.) This argument is unavailing, since there is no indication of any racial bias that could have affected the jury's verdict. Defendant was stopped by the police as a result of a 911 call informing police officers that there was a man matching Defendant's description at Defendant's exact location with a gun, not because he was racially profiled, and there is no evidence of racial bias during any of the police's subsequent investigation or Agent Stearman's handling of the case.

For the foregoing reasons, Defendant's motion for a new trial is DENIED.

DATED: April 24, 2017

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE